IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BOGUMILA JOCHIM | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| JEAN MADELINE EDUCATION | : | |
| CENTER OF COSMETOLOGY, INC. | : | |
| d/b/a THE JEAN MADELINE AVEDA | : | |
| INSTITUTE | : | NO. 13-6564 |

MEMORANDUM

Dalzell, J.                                                                                             April 8, 2015

## I.     Introduction

We consider here defendant Jean Madeline Education Center of Cosmetology, Inc., d/b/a The Jean Madeline Aveda Institute's ("Jean Madeline" or "the School") motion for summary judgment.

Plaintiff Bogumila Jochim ("Jochim"), a graduate of the School, is suing Jean Madeline for alleged violations of the Fair Labor Standards Act, 29 U.S.C. § 201, et seq. (the "FLSA") and the Pennsylvania Wage Payment and Collection Law, 43 P.S. § 260.1 et seq., claiming that she should have been paid for work done in Jean Madeline's clinic while enrolled there as a student. Jean Madeline, an accredited cosmetology school, argues that its students are not employees under the FLSA.

We have jurisdiction over Jochim's FLSA claim pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over her state law claim pursuant to 28 U.S.C. § 1367.

## II.    Standards of Review

Fed. R. Civ. P. 56(a) provides:

> A party may move for summary judgment, identifying each claim or defense -- or the part of each claim or defense -- on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

A party moving for summary judgment bears the initial burden of informing the district court of the basis for its argument that there is no genuine issue of material fact by "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted).  If the moving party meets this initial burden, Fed. R. Civ. P. 56 then obliges the non-moving party to show, via submissions beyond the pleadings, that there are genuine factual issues for trial. Id. at 324.

There is a genuine issue of material fact only when there is sufficient evidence such that a reasonable juror could find for the party opposing the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986) (explaining further that a mere scintilla of evidence is insufficient). Material facts are those that would affect the outcome of the case under the governing law. Id. at 248. We may not make credibility determinations or weigh the evidence, and we must draw all reasonable inferences in favor of the non-moving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Amour v. County of Beaver, 271 F.3d 417, 420 (3d Cir. 2001). Our function is to determine whether there is a genuine issue for trial, and we may not prevent a case from reaching a jury simply because we favor one of several reasonable views of the evidence. Abraham v. Raso, 183 F.3d 279, 287 (3d Cir. 1999) (citing Anderson, 477 U.S. at

249). However, a non-moving party cannot rely on unsupported assertions, speculation, or conclusory allegations to avoid the entry of summary judgment. Celotex, 477 U.S. at 324.

**III.     Factual Background**

For the purposes of its motion for summary judgment, Jean Madeline has accepted Jochim's deposition testimony as true. MSJ at 2 n.1. We recite the relevant facts of this case.

    **A.     Pennsylvania's Regulation of Cosmetology**

The Pennsylvania State Board of Cosmetology, pursuant to 63 Pa. Cons. Stat. Ann. § 507 et seq., regulates cosmetology schools and cosmetologists in the Commonwealth. Cosmetologists in Pennsylvania must pass an examination and obtain a license before practicing. 63 Pa. Cons. Stat. Ann. §§ 508, 509. The examination tests theoretical knowledge and practical skills. 49 Pa. Code § 7.32(c). Before taking the examination, aspiring cosmetologists must meet a host of requirements, including completing 1,250 hours as a student in a registered cosmetology school or serving as an apprentice for 2,000 hours in a licensed cosmetology salon. 63 Pa. Cons. Stat. Ann. § 510(a)(3). The Board recommends at least 1,000 hours of cosmetology skills curriculum covering cognitive and manipulative tasks. 49 Pa. Code § 7.129(a).

The Board provides that cosmetology students may practice upon the public, but only "by way of clinical work upon persons willing to submit themselves to such practice after having first been properly informed that the operator is a student." 63 Pa. Cons. Stat. Ann. § 513. Cosmetology schools are not permitted to charge for treatments provided by students and "shall only charge the reasonable cost of materials used in such treatment." Id.; see also 49 Pa. Code § 7.120(a)(1) (providing that cosmetology students who have completed 300 hours of instruction may practice on the public in limited circumstances). Schools are required to conspicuously

notify the public through signs that they are cosmetology schools and not salons. 49 Pa. Code § 7.120(b)-(c). Cosmetology schools may advertise their clinics under similar restrictions. Id. at § 7.121. Schools permitting students to practice upon the public must "require students to keep their stations clean and to assist in general cleanup and other duties that may be required in an operating salon, except that students may not be required to scrub floors, wash windows or perform janitorial tasks." Id. at § 7.123. Schools must observe the same health and safety requirements as prescribed for salons. Id. at § 7.125.

### B. Jochim's Enrollment at Jean Madeline

Jean Madeline is a licensed and accredited cosmetology school with three locations in the Philadelphia area. MSJ at 3 & Ex. B. A basic cosmetology course at Jean Madeline costs $18,680 and allows students to reach the 1,250-hour requirement the Pennsylvania statute imposes. MSJ Ex. B at 3.

Jochim enrolled at Jean Madeline in January of 2012. Jochim Dep. (MSJ Ex. A) at 32:9-16. She knew that Jean Madeline would not guarantee her a job at one of its regular salons after graduation, but thought that she would receive assistance finding a job at a salon and might have had a greater chance of being hired at an Aveda Institute. Id. at 56:19-58:21.

When Jochim enrolled at Jean Madeline, she signed an enrollment contract and no other agreements. Id. at 36:13-22. The enrollment contract provided that Jochim would pay Jean Madeline for educational services. Id. at 37:18-25. Jean Madeline helped Jochim successfully apply for financial aid, and she received both federal loans and Pell grants to cover a large portion of her tuition at Jean Madeline. Id. at 96:24-99:20, 107:13-18. Jochim graduated from Jean Madeline on June 25, 2013 after completing the required 1,250 hours of instruction. Id. at

32:6-16, 84:16-85:24. She passed the Board's exam and is now a licensed cosmetologist. Id. at 84:8-15, 83:21-23.

### C. Jochim's Education At Jean Madeline

At all stages of her education at Jean Madeline, Jochim took graded quizzes and tests. Id. at 152:12-17. Jochim received credit toward the 1,250 hour requirement while learning in the classroom, taking quizzes, taking practical tests, performing services on guests, and sanitizing her work station. Id. at 164:3-165:12. While at Jean Madeline, Jochim learned how to sanitize her work station and tools, and the examination tested these sanitation skills at length. Id. at 90:25-94:22. Jochim also received video instruction on how to greet guests and perform consultations before starting on any services, though she did not believe the teaching materials were particularly helpful. Id. at 192:11-197:18.

### D. Jean Madeline's Clinic

Jean Madeline marketed its clinic as providing students with a "true salon environment," and Jochim thought that meant the clinic allowed students to work in an environment "as though [they] were employed" and to practice skills that would be used on guests in a real salon. Id. at 51:4-25. As part of the clinic, members of the public agreed to permit Jean Madeline's students to perform cosmetic treatments on them for a fee, and guests signed a release before receiving services, indicating that they knew students would be providing those services. Donovan Dep. at 18:4-8. Jean Madeline instructors would match clients with students, who would then perform the requested treatments under supervision at the clinic.

As part of the School's clinic, instructors would provide Jochim (and other students) with a paper identifying the client and the desired treatment. Jochim would consult with the client and

then inform an instructor about what treatments and products she would be using. Jochim Dep. at 204:12-205:3. Jochim says that while she and other students were required to have opening and closing presentations with instructors about every client, she did not always have time because of how busy the clinic was, or sometimes instructors were busy with other students and Jochim would have to wait for an instructor to become available. Id. at 209:10-21, 214:5-12.

Instructors would circulate around the clinic to inquire how treatments were proceeding. Jochim reports that while the instructors' inquiries may have been cursory given how hectic the clinic was, instructors would walk by to ask if treatments were going well, and Jochim could ask a question if she felt she needed assistance. Id. at 223:20-224:9. Jochim understood that she would not be kicked out of the School even if she made a mistake while performing a treatment on a client, because the clients knew that the students were not licensed or experienced cosmetologists. Id. at 66:2-24. Jochim reported seeing students sent home for refusing to perform a treatment, but not for performing a treatment poorly. Rather, students received instruction on how to improve. Id. at 66:25-67:24.

As part of the clinic, Jochim was required to keep her work station clean. She claims that she was required to perform other janitorial, logistical, and clerical functions beyond that task. Complaint at ¶ 69(d). She describes the janitorial functions as "scrubbing sinks…cleaning the mirrors that were on empty stations, things like that, taking out the trash," "sweeping," and cleaning "anything other than [her] station." Jochim Dep. at 384:22-385:23, 386:15-17. Notwithstanding the allegations in her complaint, she could not identify in her deposition any "logistical" or "clerical" functions that she was required to perform and did not know what those terms from the complaint meant. Id. at 388:10-390:20.

### E.    Jochim's Belief That She Should Have Been Compensated For Clinical Work

Jochim received the impression, based on certain descriptions of Jean Madeline's clinic as offering a "true salon environment", that she "would be paid for services [she] rendered in the salon, in the clinic, as [the School] called it." Id. at 38:18-39:14. No one from Jean Madeline ever told her that she would be paid for her work in the clinic, but Jochim "felt [it] was implied." Id. at 42:6-43:8. Jean Madeline never paid Jochim for providing services to clients in the clinic. Id. at 46:8-12. Jochim knew that she was not a Jean Madeline employee, but thought she would receive more education before being asked to practice treatments on live clients at the clinic. Id. at 55:7-13 (explaining that Jochim thought she "would be given the education before I was asked to perform services, the education that I needed in order to perform these services in a proper manner.").

While no administrator ever told Jochim that she would be compensated for working in the clinic, Jochim says that she and all the other students were upset because the School "was making so much money" and they felt they "were being used for free labor." Id. at 46:25-47:25. When Jochim and other students asked the instructors about compensation, she says that they "laughed it off" and "always avoided the issue." Id. at 49:12-21. Jochim never used the School's complaint procedure to discuss compensation. Id. at 50:11-19.

Jochim's belief that she should be compensated also stemmed from the type of work she performed while at the clinic. She says that the School's expectations for interacting with clients at the clinic -- such as asking whether they would like additional services, educating them on retail products, asking them to rebook, and asking them for referrals -- did not seem to her like "practicing," but more like "actual salon labor" because "it's just something you would do in a

7

salon." Id. at 243:2-15. Indeed, Jochim believed that her work in the clinic did not have anything to do with her education:

> In my understanding, if you are working in a salon environment you are working on customers, you are giving them a service for which they pay for, then you are technically an employee. You are doing everything that you would be doing in a regular salon, whether it is cleaning, whether it is, you know, working the dispensary. None of that has to do with our education. I mean, folding towels or making sure the dispensary is clean, that doesn't have anything to do with our education.

Id. at 59:14-25.

She passed both the theory and practical components of her exam. Id. at 84:8-15. Jochim is now a licensed cosmetologist. Id. at 83:21-23.

**IV.    Discussion**

    **A.    <u>Whether Jochim Is An Employee Under FLSA</u>**

We instructed the parties to brief and conduct discovery on the limited issue of whether the students in Jean Madeline's clinic were "employees" within the meaning of the FLSA and the Pennsylvania Minimum Wage Act. Whether a person is an employee is a question of law. <u>Martin v. Selker Bros., Inc.</u>, 949 F.2d 1286, 1292 (3d Cir. 1991).

The FLSA is the federal statute that regulates employment and the minimum wage. The FLSA applies only if the alleged workers are "employees" within the meaning of the FLSA. <u>See Tony & Susan Alamo Found. v. Secretary of Labor</u>, 471 U.S. 290, 295 (1985); <u>Walling v. Portland Terminal Co.</u>, 330 U.S. 148 (1947). The FLSA defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e). To "employ" means "to suffer or permit to work." 29 U.S.C. § 203(g). The Pennsylvania Minimum Wage Act mirrors the FLSA, and the definitions of "employ" and "employee" are "virtually identical." <u>Commonwealth of Pa.</u>,

Dep't of Labor & Indus., Bureau of Labor Law Compliance v. Stuber, 822 A.2d 870, 873 (Pa. Commw. Ct. 2003), aff'd, 859 A.2d 1253 (Pa. 2004). Based on the "identity of purpose" between those two statutes, Pennsylvania courts employ the same tests used by the federal courts and use federal case law to determine the governing standard. Id.; see also Sherman v. American Eagle Express, Inc., 2012 WL 748400, *8-9 (E.D. Pa. Mar. 8, 2012) (Sanchez, J.) (explaining Pennsylvania courts' adoption of federal case law and tests under the FLSA for cases brought under the Pennsylvania Wage Payment and Collection Law). We will therefore conduct one legal analysis to determine whether, as a matter of law, Jochim is an "employee" of Jean Madeline.

The FLSA covers "trainees, beginners, apprentices, or learners if they are employed to work for an employer for compensation." Walling, 330 U.S. at 151. But the FLSA does not transform every training relationship into an employer-employee relationship. As broad as the terms "employee" and "employ" are, "they cannot be interpreted so as to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction." Id. at 152-53 (explaining that railroad brakemen trainees were not employees because had they "taken courses in railroading in a public or private vocational school, wholly dissociated from the railroad, it could not reasonably be suggested that they were employees of the school within the meaning of" the FLSA). Courts interpret the FLSA to apply broadly, consistent with Congress's purpose to enforce minimum standards of decency for workers. Alamo Found., 471 U.S. at 296. Nonetheless, an individual may work for a covered enterprise under the FLSA and not be an employee within the ambit of the statute. Id. at 299-300 (reviewing the holding in Walling and glossing that case to mean that trainees for a job in a similar position as students in a school whose training did not contemplate compensation were not employees under the FLSA).

9

Whether one is an employee depends upon the economic reality of the relationship. Id. at 301; see also Goldberg v. Whitaker House Coop., Inc., 366 U.S. 28, 33 (1961) (eschewing technical concepts in favor of economic realities as the test for employment). "It is a well-established principle that the determination of the employment relationship does not depend on isolated factors but rather upon the 'circumstances of the whole activity.'" Martin, 949 F.2d at 1293 (quoting Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947)). Courts generally consider six non-exclusive factors, none of which is dispositive. Id. Those factors are: (1) the degree of the putative employer's right to control the manner in which the work is to be performed, (2) the putative employee's opportunity for profit or loss depending upon his managerial skill, (3) the putative employee's investment in equipment or materials required for this task, or his employment of helpers, (4) whether the service rendered requires a special skill, (5) the degree of permanence of the working relationship, and (6) whether the service rendered is an integral part of the putative employer's business. Id.; Donovan v. DialAmerica Mktg., Inc., 757 F.2d 1376, 1382 (3d Cir. 1985).  Courts examine the circumstances of the whole activity and whether as a matter of economic reality the individuals depend upon the employer to whom they render service. Martin, 949 F.2d at 1293.[1] See also Haybarger v. Lawrence Cnty. Adult Prob. & Parole, 667 F.3d 408, 417-18 (3d Cir. 2012) (explaining the economic realities test as one depending upon the totality of the circumstances).

We consider the six factors in light of the totality of the circumstances to determine the economic realities of the relationship between Jean Madeline and Jochim.

---

[1] As noted in Atkins, other Courts of Appeals differ in their treatment of the required analysis for trainees and students, but our Court of Appeals uses an economic realities test. Atkins v. Capri Training Ctr., 2014 WL 4930906, *7 & n.4  (D.N.J. Oct. 1, 2014) (Wigenton, J.) (collecting cases).

First, we consider the degree of the putative employer's right to control the manner in which the work was to be performed. Jean Madeline instructors assigned clients and certain treatments to students in the clinic while providing students with guidance and supervision while they performed those treatments. Jean Madeline instructors would step in if Jochim or any other student asked for assistance, but the instructors would not send students away from the clinic if they performed their treatments poorly. Rather, students received instruction on how to improve. Jean Madeline also determined which tools and products students would use on guests and which treatments the School would offer to the public.

Second, we consider the putative employee's opportunity for profit or loss depending upon managerial skill. At most, Jochim could receive tips from her clients, although she had no knowledge of how the receptionists at the clinic billed such clients. Whether Jochim practiced her treatments with any particular skill or care did not affect her position as a student at Jean Madeline. Instructors chose assignments based on the number of clients in the waiting area and which students were present in the clinic at the time, though Jochim testified that she received more coloring assignments than others on the basis of her skill. Jochim Dep. at 282:21-283:3.

Third, we consider the putative employee's investment in equipment or materials required for the task or the employment of helpers. Jean Madeline provided the physical facilities Jochim required to practice treatments on clients -- including chairs, mirrors, sinks, and a space in which to work -- as well as the necessary products, such as shampoos, hair dye, towels, and the like. Jochim's tuition included $1,000 for books and equipment. Pl. Resp. in Opp. Ex. J; MSJ Ex. B. Included in this equipment was a student kit with irons, blow dryers, brushes, and other items necessary for providing treatments. Lehman Dep. at 109:1-112:11. Jochim, like all Jean

Madeline students, could not opt out of this fee and buy her own equipment, but rather had to purchase it through Jean Madeline. Id.

Fourth, we consider whether the service rendered required a special skill. Jochim was permitted to practice in Jean Madeline's clinic after completing 300 hours of classroom training. The only special skill required of Jochim was her completion of those hours in a licensed and accredited cosmetology school and passing Jean Madeline's quizzes or tests to proceed to the next level of training.

Fifth, we consider the permanence of the working relationship. Jochim enrolled in Jean Madeline in January of 2012 and graduated in June of 2013, although she took a four month leave of absence toward the end of 2012. Jochim Dep. at 32:9-16. During that enrollment period, Jochim completed her required 1,250 hours before sitting for the examination. Jochim had no guarantee of employment after graduation, although she had an understanding that Jean Madeline would help her find a job, and that the Aveda Institute had a preference for Jean Madeline graduates.

Sixth, we consider whether the service rendered was an integral part of the alleged employer's business. Jochim alleges that Jean Madeline makes a profit off of its clinical program, while Jean Madeline asserts that the clinic operates at a loss.

Considering these six factors -- none of which is dispositive -- and the economic reality of the relationship in light of the totality of the circumstances, Jochim was not an employee of Jean Madeline under the FLSA. Rather, Jochim was a student who participated in a realistic clinic mimicking an actual salon as part of her education.

Only the sixth factor possibly weighs in favor of finding that Jochim was an employee within the meaning of the FLSA. Jochim alleges that Jean Madeline's profits from its clinic are

an integral part of its business, while Jean Madeline asserts that its main business is the School itself and that the clinic does not generate revenue. But even if we accept Jochim's assertion and credit her expert's report to that effect, see Pl. Reply Ex. 1, the entirety of the economic realities weighs against finding an employment relationship.

Jean Madeline is a cosmetology school that offers, as part of its basic cosmetology curriculum, a realistic clinic in which students can practice treatments and hone customer service skills, retail skills, and sanitary practices as Pennsylvania law requires. Jochim's tuition included fees to pay for a student kit full of tools used by cosmetologists, and she was responsible for keeping track of, and caring for, those tools. This is an unsurprising line item in a tuition bill for a student who will be engaged in clinical work.

Jochim, like many students in other education programs providing a clinical experience, was asked to perform increasingly complex tasks, with increased independence, albeit under supervision. Her feeling that she was under-supervised, or that her instructors were busy, or that she did not like her assignments, does not create an employment relationship. Jochim began clinical work after 300 hours of instruction. It comes as no surprise that she felt apprehensive or unprepared for her first treatment -- 300 hours is not a lot of time to go from a book to a live model -- but Pennsylvania's General Assembly has decided that it is enough time to permit a cosmetology student to move forward with clinical work. Such lack of training weighs against an employment relationship. Jochim was also required, as part of her clinical work, to clean her work station and assist in keeping the clinic as a whole clean and sanitary. This is consistent with clinical educational work, especially given the Board's thorough testing about sanitation on its cosmetology licensing examination. Jochim was not able to identify any janitorial work falling

outside the scope of permissible sanitation-related training or sanitary tasks related to the practice of cosmetology in a clinical setting.

In the clinic, Jochim was graded on her completion of four tasks related to client satisfaction -- including whether she offered such clients additional treatments, products, another booking, or asked for a referral. Though Jochim may have objected to the criteria Jean Madeline used to evaluate her, or how clients were distributed among students, her work in the clinic was not like that of an employee in an employment relationship. She was not evaluated or disciplined based upon the quality of her work and was, at all times, under instructor supervision.

Jochim paid Jean Madeline to teach her how to become a successful cosmetologist, or at the very least, to provide her with the required number of hours, minimum knowledge, and basic technical skills required to sit for and pass Pennsylvania's cosmetologist licensing exam. Jochim's experience at the clinic was, and was meant to be, cognate with the experience of actually working in a licensed salon as a licensed cosmetologist. In pursuit of this realistic learning experience, Jean Madeline enabled its students to work on live members of the public under supervision and required students to perform the tasks that a licensed cosmetologist must know how to perform in order to be licensed, including the sanitary and hygienic aspects of cosmetology. Jean Madeline charged the public a fee for the services its students provided, but whether those fees run afoul of Pennsylvania law does not affect whether the students were employees under the FLSA. Further, Jochim's relationship with Jean Madeline was never meant to be enduring. Like many schools, Jean Madeline provided job placement assistance and may have had companies that preferred its graduates on the basis of its training, but Jean Madeline provided no guarantee of employment after graduation.

Jean Madeline's alleged profit from its clinical program does not change our analysis under the FLSA. Even assuming, as Jochim contends, that Jean Madeline's clinic is profitable, that factor alone does not suffice to transform the economic reality of the relationship between Jean Madeline and Jochim into one qualifying as employee/employer under the FLSA. Nor does Jochim's belief that she would be, or should have been, paid render her an employee within the meaning of the FLSA. By Jochim's account, no Jean Madeline instructor, administrator, or employee ever told her that she would be paid for work conducted at the clinic. The entire set-up of the clinic made clear to students and guests alike that the treatments being offered were performed by students for practice. Neither Jochim's mistaken impression from Jean Madeline's pre-enrollment statements, nor grousing with her fellow students that they should have been paid, changes the economic reality of the relationship between Jean Madeline and Jochim. Nor do such beliefs or impressions, even taken as true, suggest that Jean Madeline somehow suffered or permitted Jochim to work for it as an uncompensated employee. The economic reality of the relationship was that Jochim paid the School tuition in exchange for an education in cosmetology, and a significant part of her education included working in Jean Madeline's clinic as a student.

Because Jochim has failed to show as a matter of law that she was an employee under the FLSA, there are no disputes of material fact for trial, and Jean Madeline is entitled to judgment as a matter of law under the statute.

      B.      **<u>Jochim's Motion To Strike Jean Madeline's Expert Report</u>**

Jochim moved to strike Jean Madeline's expert report. Given that we may decide this motion for summary judgment without considering Jean Madeline's report, and in fact have

given Jochim the benefit of the doubt of her expert's report that Jean Madeline does make a profit on its clinic, we will deny her motion as moot.

**V.    Conclusion**

Whether Jochim was an employee under the FLSA is a question of law for us to decide. Even taking the facts and inferences in the light most favorable to Jochim as the non-moving party, she cannot show that she was an employee under the FLSA. As a result, claims under both the FLSA and the Pennsylvania Wage Payment and Collection Law fail.

We will therefore grant summary judgment to Jean Madeline. An appropriate Order follows.

BY THE COURT:

 /s/ Stewart Dalzell, J.
Stewart Dalzell, J.